IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DARRIN HUNT,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 14-cv-345-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Darrin Hunt seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in April, 2011, alleging disability beginning on April 15, 2010. (Tr. 18). After holding an evidentiary hearing, ALJ William E. Sampson denied the application in a written decision dated September 14, 2012. (Tr. 18-30). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 10.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ erred in weighing the medical opinions.

2. The ALJ erred in evaluating plaintiff's credibility.

3. The RFC assessment was erroneous because of the errors set forth in the first two points, and because the ALJ failed to consider the effects of plaintiff's depression and anxiety.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Hunt was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d

1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Sampson followed the five-step analytical framework described above. He determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of late effects of pedicle screw fixation and discectomy at the L5-S1 vertebral level with a decompression lumbar laminectomy and foraminotomy. He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Hunt had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. He was, however, not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1.  **Agency Forms**

Plaintiff was born in 1971, and was 38 years old on the alleged onset date of April 15, 2010. He is insured for DIB through September 30, 2015. (Tr. 143). He completed one year of college. He had worked as an assistant manager of a restaurant and as a factory worker. (Tr. 147).

Plaintiff submitted a Function Report in May, 2011, in which he stated that, because of back pain, he was unable to stand for more than 1 to 2 hours, or to sit for longer than 2 hours. He had to lie down for 1 to 2 hours to get relief. He was unable to lift anything over 10 pounds. He reported that he did very little housework or cooking. He lived with his wife and children. He spent the day watching TV and reading. He walked half a block a day to check the mail. He went grocery shopping with his wife, but had to lean on the cart or use a motorized cart. He had a TENS unit which took the edge off his pain. (Tr. 160-167).

2.  **Evidentiary Hearing**

Mr. Hunt was represented by an attorney at the evidentiary hearing on August 28, 2012. (Tr. 37).

Plaintiff testified that his back pain was worse since he had surgery in April, 2010. He had pain in his low back every day. He took MS-Contin, Flexeril, and an antidepressant. The medicines reduced his pain but did not eliminate it. He had to sit with his feet up and lie down throughout the day. (Tr. 40-41). He had also been depressed since the surgery. He was irritable "from not feeling like a

6

man." (Tr. 45-46).

A dorsal column stimulator had been recommended, but plaintiff's doctor had not been able to locate anyone who would accept his medical card (Medicaid) for that. (Tr. 50). He also had been unable to find another surgeon to give him a second opinion after one of the screws in his back broke. (Tr. 39). He would be willing to have another surgery if he could find a different doctor to do it. (Tr. 51).

Plaintiff had worked at a company that made fertilizer equipment. He operated a water jet, which is tool used to cut steel. He had also worked as a manager of a McDonald's restaurant. (Tr. 52-54).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to only occasional climbing of ramps and stairs, occasional balancing, stooping, crouching, kneeling and crawling, with no climbing of ladders, ropes or scaffolds. He was further limited to a total of 2 hours of standing/walking per day and needed a sit/stand option with the ability to stand for about 5 minutes every hour. The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which he could do. Examples of such jobs are telephone information clerk, order clerk and document preparer. (Tr. 56-57).

### 3. Medical Treatment

On April 15, 2010, the alleged onset date, Dr. Pradeep Narotam operated on

plaintiff's low back.  Dr. Narotam noted that Mr. Hunt had a history of chronic low back pain with pain in his legs, and increasing symptoms of spinal claudication. An MRI showed a herniated disc with end-plate changes at L5-S1.  The surgery consisted of pedicle screw fixation at L5 and S1, an L5-S1 discectomy, and decompressive lumbar laminectomy of L5 with foraminotomy of the L5 and S1 nerve roots.  (Tr. 518-519).

Three months after surgery, x-rays showed that the hardware was intact with no instability.  Dr. Narotam rated his fusion at grade four.  Plaintiff said he had pain in his low back.  Dr. Narotam diagnosed myofascial pain syndrome.  (Tr. 543-544).  On July 27, 2010, a nurse practitioner in Dr. Narotam's office administered trigger point injections.  (Tr. 549).  Dr. Narotam's office reported that he was "not fit for duty" on July 28, 2010.   (Tr. 551).

Mr. Hunt called Dr. Narotam's office on August 2, 2010, and reported that Flexeril and Vicodin were not helping with his pain.   He was doing physical therapy exercises.  Dr. Narotam indicated that his pain was muscular and that physical therapy would help. He did not change his medications.   (Tr. 554).

In October, 2010, x-rays showed that the hardware was in position.  (Tr. 558).  At a visit with Dr. Narotam, plaintiff complained of constant low back pain and said that he "wishes he'd never gotten the surgery."  Plaintiff continued to smoke, "despite being informed of its deleterious effect on his fusion and on worsening spine pathology."  The doctor noted back tenderness on exam, but straight leg raising was normal and he had no motor or sensory deficits.  Dr.

8

Narotam indicated that he could return to work with "light duty 15-30 pound lifting restriction."  (Tr. 561- 562).   On the same day, Dr. Narotam's nurse practitioner wrote on a form that plaintiff could not return to work until he was seen again.   She wrote "continues with therapy & not able to return to work at full duty at this time."  (Tr. 560).

The next visit with Dr. Narotam was in April, 2011.   Mr. Hunt said that he still had low back pain and some posterior thigh pain.   His gait was steady with no limp.   He had paraspinal tenderness with no claudication or radicular symptoms.   X-rays showed the hardware was in good position.   The diagnoses were mechanical low back pain and post-laminectomy syndrome.   Dr. Narotam recommended that he apply low heat to the affected area, 30 minutes on and 30 minutes off.   He was to walk several times a day as tolerated.   He was to avoid sitting for more than 30 minutes at a time.   He was discharged to his primary care physician.   (Tr. 568-570).

Mr. Hunt's primary care physician was Dr. David Davis.   Plaintiff saw Dr. Davis regularly following his back surgery.   Dr. Davis' records indicate that plaintiff complained of back pain.   Dr. Davis noted diffuse tenderness of the paraspinal muscles, loss of lumbar lordosis and multiple trigger points.   He prescribed pain medication including Vicodin, Neurontin and Methadone.   He also prescribed Zanaflex for muscle spasms.   (Tr. 362-392).

Dr. David Fletcher performed an independent medical evaluation of plaintiff on February 14, 2012.   Dr. Fletcher is board-certified in Occupational and

9

Preventative Medicine. The record does not reflect who requested that he examine Mr. Hunt. Dr. Fletcher's primary diagnosis was failed low back syndrome with chronic right L5 radiculopathy. His secondary diagnosis was depression. He noted that there was "no evidence of overt symptom magnification." He concluded that Mr. Hunt should be limited to lifting only 10 pounds and no repetitive bending at the waist, and that he have a sit/stand option. He also suggested that he undergo a functional capacity exam to define his work capacity. (Tr. 670-685).

Chet Clodfelter, a physical therapist, performed a functional capacity exam on April 10, 2012. Mr. Clodfelter concluded that plaintiff was capable of working at the light exertional level with some postural limitations. The limitations included never "work bent over – standing/stooping," and only occasional standing, kneeling, climbing stairs and repetitive squatting. (Tr. 686-695).

In March, 2012, plaintiff saw Dr. Davis for depression and muscle spasms in his back. Dr. Davis noted that he appeared uncomfortable and fatigued. He prescribed Flexeril for his back and Remeron for his mood swings. (Tr. 654-655). Two weeks later, Dr. Davis increased the dosage of Remeron. (Tr. 652-653).

Mr. Hunt returned to Dr. Narotam on May 9, 2012. He complained of low back pain. Dr. Narotam noted that he had a normal gait and sat cross-legged in the waiting room. On exam, he had paraspinal tenderness, straight leg raising was limited to 70, and he had no focal neurological deficits. Dr. Narotam wrote "Displays symptom exaggeration behavior." An x-ray showed that the right S1

screw was fractured, and there was slight retrolisthesis of L5 on S1.[2]  Dr. Narotam rated his fusion as "2 Poor."  He again recommended that Mr. Hunt apply heat for 30 minutes on and 30 minutes off, and walk as tolerated for exercise.  He again noted that plaintiff could "Return to work with light duty 15-30 pound lifting restriction."  (Tr. 662-669).

## Analysis

ALJ Sampson made a glaring error in his review of the medical evidence. He stated that, after the fractured pedicle screw was discovered in May, 2012, "the claimant underwent an immediate repair procedure."  He further stated that, after repair of the screw, "the claimant's gait was normal, and no abnormalities were noted."  See, Tr. 27.  In fact, the record contains no evidence that the fractured screw was repaired.

It is entirely unclear why the ALJ thought that the screw was repaired.  The Commissioner acknowledges that there is no evidence of such a repair, but argues that the ALJ's error does not require remand because "the discussion of the [screw repair] surgery itself was not the ALJ's sole reasoning for finding Plaintiff not disabled."  See, Doc. 24, p. 18.  The Court disagrees.

The ALJ's misunderstanding of the medical evidence affected his assessment of plaintiff's credibility.  The first reason given by the ALJ for his credibility assessment was that plaintiff's allegations about his symptoms were "not consistent

---

[2] Retrolisthesis is "backward slippage of one vertebra onto the vertebra immediately below."  See, medical-dictionary.thefreedictionary.com/retrolisthesis, visited on April 14, 2015.

11

with the available objective medical evidence." See, Tr. 23. In view of the ALJ's serious mistake as to the nature of the medical evidence, that conclusion is not supported by substantial evidence.

The ALJ's misunderstanding of the medical evidence also affected his weighing of the medical opinions. The ALJ gave significant weight to Mr. Clodfelter's opinion that plaintiff was capable of light work on a full-time basis. See, Tr. 28. However, Mr. Clodfelter performed his evaluation one month before the fractured screw was discovered, and it is unknown whether the screw was fractured at the time of his evaluation. And, as plaintiff points out, the ALJ failed to note that Mr. Clodfelter limited plaintiff to never stooping, rather than occasional stooping.

Further, the ALJ stated that Mr. Clodfelter's opinion was consistent with the opinion expressed by Dr. Narotam after the "screw repair." According to the ALJ, on the last visit, Dr. Narotam found that plaintiff's gait was normal, "no abnormalities were noted," and plaintiff was "cleared for light duty work." See, Tr. 27. It is not correct to say that no abnormalities were noted. In fact, Dr. Narotam noted paraspinal tenderness and straight leg raising limited to 70/70. He also assessed plaintiff's fusion as grade "2 Poor." (Tr. 664-665). And, as plaintiff points out, the ALJ ignored the fact that, at that May, 2012, visit, Dr. Narotam also instructed plaintiff to apply heat to his low back for 30 minutes on and 30 minutes off. (Tr. 648). The Commissioner attempts to excuse the ALJ's omission of this fact by characterizing this instruction as a treatment recommendation rather than a

12

functional limitation. However, the ALJ himself did not make that distinction. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, *SEC v. Chenery Corporation*, 318 U.S. 80 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). The ALJ's mistaken view of the medical evidence renders his weighing of the medical opinions erroneous. See, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

It is well-settled that an ALJ's decision must build a "logical bridge" from the evidence to his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). ALJ Sampson failed to do so here. His decision rests on a fundamentally flawed understanding of the medical evidence, and is therefore not supported by substantial evidence. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.

13

2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Hunt is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's Motion for Summary Judgment **(Doc. 20)** is **GRANTED**.

The Commissioner's final decision denying Darrin Hunt's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**     April 15, 2015.


                              s/ Clifford J. Proud
                              **CLIFFORD J. PROUD**
                              **UNITED STATES MAGISTRATE JUDGE**